No. 22-6100

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

BRENDA ANDREW, *et al.*,

*Plaintiffs-Appellants*,

v.

SCOTT CROW, in his official capacity, *et al.,*

*Defendants-Appellees.*

On appeal from the United States District Court
for the Western District of Oklahoma
The Hon. Stephen P. Friot
No. 14-CV-665-F

## APPELLEES' BRIEF

ZACH WEST
  *Solicitor General*
BRYAN CLEVELAND
  *Deputy Solicitor General*
AUDREY WEAVER
  *Assistant Solicitor General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
zach.west@oag.ok.gov

*Counsel for Defendants-Appellees*

## ORAL ARGUMENT IS NOT REQUESTED

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

JURISDICTIONAL STATEMENT ........................................................................ 2

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW .................................. 2

STATEMENT OF THE CASE .............................................................................. 3

    I.  Oklahoma juries sentenced Plaintiffs to death
for horrendous murders. ............................................................................ 3

    II.  Plaintiff inmates sued to stop their executions, and courts repeatedly
declined to prevent them from facing justice for their crimes. ............... 5

    III.Plaintiffs fell "well short" of their Eighth Amendment burden at trial,
and then declined to appeal the district court's findings and conclusions. .................... 8

    IV.The district court correctly analyzed the law in granting summary
judgment to Defendants on Plaintiffs' access-to-counsel claims. ....................... 9

SUMMARY OF THE ARGUMENT ...................................................................... 12

ARGUMENT ................................................................................................... 13

    I.  The district court correctly granted summary judgment on Counts IV and V
because Plaintiffs do not have a valid access-to-counsel claim. ....................... 14

        A.    *Plaintiffs lack standing to challenge Oklahoma's execution protocol over
hypothetical grievances in the execution process.* ....................... 14

        B.    *There is no right to counsel to search for hypothetical grievances.* ............. 21

        C.    *The record does not support Plaintiffs' attempts to establish a presumption of error.* 25

        D.    *Inserting hostile lawyers with cell phones into executions would create substantial
practical problems and imperil the entire process.* ....................... 28

CONCLUSION ................................................................................................ 30

STATEMENT REGARDING ORAL ARGUMENT ................................................ 31

CERTIFICATE OF COMPLIANCE ..................................................................... 32

CERTIFICATE OF DIGITAL SUBMISSION ....................................................... 32

CERTIFICATE OF SERVICE ............................................................................. 32

# Table of Authorities

## Cases

*Anderson v. City of Bessemer City, N.C.,*
    470 U.S. 564 (1985) ..............................................................................................8

*Arthur v. Comm'r, Alabama Dep't of Corr.,*
    680 F. App'x 894 (11th Cir. 2017) (unpublished) ..........................................10

*Arthur v. Dunn,*
    2017 WL 1362861 (M.D. Ala. April 12, 2017) ...............................................11

*Baze v. Rees,*
    553 U.S. 35 (2008) ........................................................................................17, 25

*Bucklew v. Precythe,*
    139 S. Ct. 1112 (2019) ......................................................................................27

*Coe v. Bell,*
    89 F. Supp. 2d 962 (M.D. Tenn. 2000), *vacated as moot,*
    230 F.3d 1357 (6th Cir. 2000) .....................................................................10-11

*Cooey v. Strickland,*
    No. 2:04CV1156, 2011 WL 320166 (S.D. Ohio Jan. 28, 2011) ....................19

*Crow v. Jones,*
    142 S. Ct. 417 (2021) ...........................................................................................7

*Dobbs v. Jackson Women's Health Org.,*
    142 S. Ct. 2228 (2022) .......................................................................................27

*Est. of Clayton Lockett v. Fallin,*
    841 F.3d 1098 (10th Cir. 2016) ...............................................................9, 10, 29

*First Amend. Coal. of Ariz. v. Ryan,*
    938 F.3d 1069 (9th Cir. 2019) .....................................................................14, 27

*Garner v. Jones,*
    529 U.S. 244 (2000) .......................................................................................17-18

*Glossip v. Gross,*
  576 U.S. 863 (2015) ................................................................5

*Grant and Postelle v. Crow,*
  No. 22-6012 (10th Cir.)..........................................................7

*Grayson v. Warden,*
  672 F. Appx 956 (11th Cir. 2016) (unpublished) ..................... 10, 14

*Hoffman v. Jindal,*
  No. 12CV796, 2014 WL 130981 (M.D. La. Jan. 10, 2014) .........................19

*Jones v. Crow,*
  No. 21-6139 (10th Cir. Oct. 27, 2021).................................7

*Jones v. Crow,*
  No. 21-6139, 2021 WL 5277462 (10th Cir. Nov. 12, 2021) .........................7

*Lewis v. Casey,*
  518 U.S. 343 (1996) ................................................1, 14, 15

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) .................................................. 15, 18

*Mann v. Reynolds,*
  46 F.3d 1055 (10th Cir. 1995) ...................................21, 22, 30

*McGehee v. Hutchinson,*
  463 F. Supp. 3d 870 (E.D. Ark. 2020) .............................15, 19, 21

*Pennsylvania v. Finley,*
  481 U.S. 551 (1987) .................................................24

*Phillips v. DeWine,*
  841 F.3d 405 (6th Cir. 2016) .................................14, 19, 21

*Ramirez v. Collier,*
  142 S. Ct. 1264 (2022) ......................................23, 26-27, 30

*Stouffer v. Crow,*
  No. 21-6153 (10th Cir.).........................................7

*TransUnion LLC v. Ramirez,*
  141 S. Ct. 2190 (2021) ...........................................................................20

*Turner v. Safley,*
  482 U.S. 78 (1987) .......................................................................... 22, 30

*United States v. Clonts,*
  25 F.3d 1058 (10th Cir. 1994) ................................................................8

*United States v. Watson,*
  766 F.3d 1219 (10th Cir. 2014) .............................................................8

*Warner v. Gross,*
  776 F.3d 721 (10th Cir. 2015) ...............................................................5

*Whitaker v. Collier,*
  862 F.3d 490 (5th Cir. 2017) ................................................10, 14, 24

*Whitaker v. Livingston,*
  732 F.3d 465 (5th Cir. 2013) ................................................ 14-15, 24

*Wilburn v. Mid-S. Health Dev., Inc.,*
  343 F.3d 1274 (10th Cir. 2003) ...................................................16, 20

*Wilkins v. City of Tulsa, Oklahoma,*
  33 F.4th 1265 (10th Cir. 2022) ...........................................................13

*Zink v. Lombardi,*
  783 F.3d 1089 (8th Cir. 2015) .............................................................14

## STATUTES

18 U.S.C. § 3599 ........................................................... 11, 15, 16, 25

28 U.S.C. § 1291 .......................................................................................2

## RULES

Fed. R. Civ. P. 56(a) ...........................................................................13

## OTHER AUTHORITIES

Staff Report, *Oklahoma executes death row inmate James Coddington*,
   KOCO (Aug. 25, 2022) ...................................................................................................7

## INTRODUCTION

After a week-long trial, the court below definitively upheld the constitutionality of Oklahoma's lethal injection policies and three-drug protocol. Rather than appeal that holding, or anything relating to trial, the Plaintiff inmates have chosen instead to appeal a single tertiary issue that the court below decided merited summary judgment for Defendants.  Specifically, they demand that a roving lawyer with a cell phone be allowed to monitor—and even intervene—in an execution process that has been deemed constitutional for every execution in Oklahoma. They assert this speculative right to assistance in searching for new legal claims because they have failed to assert any existing claim on which they are being denied access to counsel or the courts. They already litigated their Eighth Amendment claims, lost, and then failed to appeal.

As this Court recently explained in denying a stay to one inmate, "a plaintiff must allege harm separate from whatever is interfering with the plaintiff's access to the courts. Otherwise, the plaintiff has failed to allege an actual injury, and, in consequence, the court lacks Article III jurisdiction over the claim." Order, Aug. 20, 2022, at 3-4 (citing *Lewis v. Casey*, 518 U.S. 343, 349 & n.1, 351 (1996)). Indeed, this Court only retained jurisdiction over this appeal because the appeal would supposedly raise other issues. *Id.* at 4 n.2. Now that Plaintiffs have forfeited all other issues by not raising them on appeal, this Court lacks Article III jurisdiction for the reasons this Court previously stated.

As the district court and this Court have held in this case, and multiple circuits have held in other cases, there is no constitutional right to counsel to search for hypothetical claims. Reversing the district court would therefore create a circuit split and recognize a novel constitutional right solely for the purpose of hindering constitutional executions. It would also inevitably lead to livestreamed micromanagement of the execution process by federal courts. This Court should decline Plaintiffs' invitation down this path and either affirm the district court's grant of summary judgment or dismiss this appeal for lack of Article III jurisdiction.

## JURISDICTIONAL STATEMENT

While this Court has appellate jurisdiction over summary judgment orders on federal questions, 28 U.S.C. § 1291, it lacks Article III jurisdiction because Plaintiffs lack standing to pursue hypothetical future legal grievances.

## PRIOR OR RELATED APPEALS

Prior appeals include *Warner v. Gross*, No. 14-6244; *Glossip v. Gross*, No. 19-6002, *Lay v. El Habti*, No. 21-6101; *Grant v. El Habti*, No. 21-6129; *Jones v. Crow*, No. 21-6139; and *Grant v. Crow,* No. 22-6012. A related appeal is *Stouffer v. Crow*, No. 21-6153.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

Do Plaintiff inmates have a constitutional right to have counsel at their side during their execution, solely to search for hypothetical legal grievances or claims?

<u>S</u>TATEMENT OF THE <u>C</u>ASE

## I.    Oklahoma juries sentenced Plaintiffs to death for horrendous murders.

Twenty-seven death row inmates are a part of this appeal. All were long ago convicted of murder and sentenced to death by juries of their peers for intentionally and horrifically taking the lives of their fellow human beings.

- <u>Brenda Andrew</u> shotgunned her husband, Rob Andrew (39), to death in 2001, as part of a scheme with her lover, James Pavatt, to recover insurance money.

- <u>Ronson Bush</u> gunned down his friend, Billy Harrington (35) in 2008, tied him to a pickup truck, and dragged him more than 200 yards.

- <u>Jemaine Cannon</u> beat and stabbed 20-year-old Sharonda Clark three times in the neck in 2005, leaving her two young children without a mother.

- <u>Benjamin Cole</u> snapped his nine-month-old daughter Brianna Cole's spine in half in 2002 because she was crying while he was playing video games.

- <u>Carlos Cuesta-Rodriguez</u> shot Olimpia Fisher (43) twice in the face when she tried to leave him in 2003, in front of her pregnant 18-year-old daughter.

- <u>Scott Eizember</u> broke into the home of A.J. (76) and Patsy Cantrell (70) in 2003; when they returned home, he shot Patsy in the back with a shotgun and beat A.J. over the head, leaving him to die under his wife's body.

- <u>Richard Fairchild</u> burned and then beat his girlfriend's three-year-old son Adam Broomhall to death in 1993 because he wet the bed.

- <u>Richard Glossip</u> paid Justin Sneed to beat motel owner Barry Van Treese, a husband and father of seven, to death with a baseball bat in 1997.

- <u>Clarence Goode</u> and his accomplices, in a 2005 home invasion, murdered Mitch Thompson (28), Tara-Burchett-Thompson (25), and Kayla Burchett (10), with a barrage of bullets while they slept.

3

- <u>Wendell Grissom</u>, during a 2005 home invasion, shot 23-year-old Amber Matthews in the head twice while she was protecting her friend's two young children and pleading for her life; Matthews was training to become a nurse.

- <u>Phillip Hancock</u> shot and killed 37-year-old handyman Robert Jett, Jr., and 58-year-old Vietnam veteran James Lynch at Jett's home in 2001.

- <u>John Hanson</u> carjacked, kidnapped, and executed 77-year-old Mary Bowles in 1999; his accomplice murdered innocent bystander Jerald Thurman, a 44-year-old small business owner beloved in the Owasso, Okla. community.

- <u>Marlon Harmon</u> shot convenience store owner Kamal Choudhury (55) three times during a robbery in 2004; Kamal left behind a wife and two sons.

- <u>Raymond Johnson</u> in 2007 beat his ex-girlfriend Brooke Whitaker (24) with a claw hammer, covered the house and her seven-month-old daughter, Kya Whitaker, in gasoline, and set them on fire, killing both Brooke and Kya.

- <u>Wade Lay</u> murdered security guard and Air Force veteran Kenneth Anderson (36) during a bank robbery committed with his son in Tulsa in 2004.

- <u>Emmanuel Littlejohn</u> murdered 31-year-old Root-N-Scoot employee Kenneth Meers as part of a robbery in 1992; Meers was shot in the face.

- <u>Ricky Malone</u> shot Okla. Highway Patrol Trooper Nikky Joe Green (35) twice in the head in 2003 when Green tried to arrest him for methamphetamine production; Green was a husband, father of three and a pastor.

- <u>Mica Alexander Martinez</u> brutally murdered Martha "Faye" Miller (55) and Carl Miller (64) during a home invasion in 2009; he also raped Faye and severely beat the couples' grown son.

- <u>Alfred Mitchell</u> chased, stabbed, and brutally bludgeoned 21-year-old Elaine Scott to death in 1991 while she was working at a community center.

- <u>James Pavatt</u> shotgunned businessman and father Rob Andrew (39) to death in 2001, as part of a scheme with Andrew's wife to recover insurance money.

- <u>Richard Rojem</u> kidnapped and raped his seven-year-old ex-stepdaughter, Layla Dawn Cummings, in 1984; he then fatally stabbed her in the neck, back, and vagina and dumped her half-naked body in a field.

- <u>James Ryder</u> shotgunned and brutally beat to death a mother and her son, Daisy Hallum (70) and Sam Hallum (38), in 1999 after they hired him to take care of their home and horses in Pittsburg County, Okla.

- <u>Anthony Sanchez</u> abducted, raped, sodomized, and shot 21-year-old Juli Busken in the head in 1996; Busken had just graduated from OU with a degree in fine arts and emphasis on ballet.

- <u>Kendrick Simpson</u> shot and killed Glen Palmer (20) and Anthony Jones (19) in 2006; Simpson fired an AK-47 into their moving car while driving.

- <u>Michael D. Smith</u> forced his way into the apartment of children's hospital worker Janet Moore (41) in 2002 and shot her in the chest in her bedroom; soon after, he shot A-Z Mart employee Sarath "Babu" Pulluru (24) as she pleaded for her life, and then he set her body and the store on fire.

- <u>Kevin Underwood</u> abducted, raped, brutalized, and savagely murdered ten-year-old Jamie Rose Bolin in 2006 in Purcell, Okla.; her remains were found stuffed in a tub in his apartment closet.

- <u>Tremane Wood</u> murdered 19-year-old Ronnie Wipf as part of a New Years' robbery scheme in 2002; Wipf was stabbed in the chest with a knife.

## II. Plaintiff inmates sued to stop their executions, and courts repeatedly declined to prevent them from facing justice for their crimes.

This lawsuit began on June 25, 2014. ROA, Vol. I, at 65. At that time, several death-row inmates in Oklahoma moved for a preliminary injunction to stay their executions. *Id.* at 68. The district court denied the injunction, and the denial was affirmed by this Court and the U.S. Supreme Court in thorough opinions. *See Glossip v. Gross*, 576 U.S. 863, 867 (2015); *Warner v. Gross*, 776 F.3d 721, 724 (10th Cir. 2015).

Oklahoma did not conduct executions for several years thereafter, initially to conduct investigations into its protocol after the Clayton Lockett and Charles Warner executions, and then for several years because the State was unable to acquire the appropriate drugs necessary for lethal injections under Oklahoma law. *See, generally*, ROA, Vol. II, at 319, 767-68. After Oklahoma was able to secure a source for the necessary execution drugs, the State in February 2020 informed Plaintiffs of its new protocol and ability to move forward with executions, and Plaintiffs reopened this litigation. *Id.* at 319, 768.

As the court below found, Oklahoma's new policy/protocol contains "detailed provisions" concerning execution staffing, IV Team qualifications, training, designation and escorting of witnesses, procedures leading up to the execution, news media access, IV insertion, procedures in the execution chamber, post-execution procedures, after-action reviews, and "the preparation and administration of the lethal injection drugs." *Id.* at 2483-84; ROA Vol. I, at 800-855. Chart D of the new protocol sets forth the three-drug combination challenged at trial. ROA Vol. II, at 2484; ROA Vol. I, at 838-39. *First*, 500 milligrams of midazolam are given to induce anesthesia. *Second*, 100 milligrams of vecuronium bromide, pancuronium bromide, or rocuronium bromide are given to paralyze the inmate. *Third*, 240 milliequivalents of potassium chloride are given to stop the inmate's heart. ROA Vol. II, at 2484-87 & n.9; ROA Vol. I, at 838-839.

Significant here, the new protocol allows inmates to have lawyers with them until two hours before the execution. ROA Vol. I, at 847, 5204-5205.

After successfully obtaining dismissal of several of Plaintiffs' claims, ROA, Vol. I, at 383-93, Defendants moved for summary judgment on February 19, 2021. *Id.* at 749. The court granted partial summary judgment to Defendants on August 11, 2021. *Id.* at 5178-5220. That order included the claim at issue here. *Id.* at 5204-5211.

The case proceeded to a bench trial on Plaintiffs' Eighth Amendment claim in Count II of the third amended complaint, a trial that lasted six days and involved nearly a dozen witnesses, expert and otherwise. The court then issued detailed findings of fact and conclusions of law, holding that Oklahoma's execution protocol is constitutional and "worked as intended" in recent executions. ROA, Vol. II, at 2479-2523.

During the recent district court litigation in this case, this Court has reviewed the constitutionality of Oklahoma executions four times. This Court granted a stay before any of the recent executions occurred, *Jones v. Crow*, No. 21-6139, Order at 10-11 (10th Cir. Oct. 27, 2021), which the Supreme Court summarily vacated, *Crow v. Jones*, 142 S. Ct. 417 (2021). This Court then affirmed the denial of a preliminary injunction. *Jones v. Crow*, No. 21-6139, 2021 WL 5277462, at *1 (10th Cir. Nov. 12, 2021).

Oklahoma has now executed five inmates in the past year, and the facts of several of these executions were re-litigated three times, in two injunction motions and at trial. Subsequent appeals involving the facts of recent executions all led this Court to

repeatedly affirm that no stay was warranted. *See Stouffer v. Crow*, No. 21-6153; *Grant and Postelle v. Crow*, No. 22-6012. The most recent execution, which occurred after this appeal was initiated and a stay denied, was by all accounts without incident. *See, e.g.*, Staff Report, *Oklahoma executes death row inmate James Coddington*, KOCO (Aug. 25, 2022) ("Oklahoma Department of Corrections Director Scott Crow and media witnesses did not report any complications with the execution.").[1]

## III. Plaintiffs fell "well short" of their Eighth Amendment burden at trial, and then declined to appeal the district court's findings and conclusions.

In its post-trial ruling and in pre-trial injunction rulings, the district court issued findings of fact that have not been expressly challenged by Plaintiffs on appeal and, as a result, must be accepted as true absent clear error. *See United States v. Watson*, 766 F.3d 1219, 1234 (10th Cir. 2014); *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985); *United States v. Clonts*, 25 F.3d 1058 (10th Cir. 1994) (unpublished) ("Because [Clonts] does not contend the findings are clearly erroneous and takes issue only with the conclusions, we have to assume the court's factual findings are sound.").

Most significantly, the district court found that all four recent executions in Oklahoma proceeded in a constitutional manner and that the inmates arguing otherwise "have fallen well short of clearing the bar set by the Supreme Court" for a successful Eighth Amendment challenge. ROA, Vol. II, at 2522-2523. In particular, the court held

---

[1] *Available at* www.koco.com/article/oklahoma-james-coddington-execution/40990511.

that the "Chart D sequence" in Oklahoma's protocol "worked as intended" in all recent executions. *Id.* at 2515. The court was especially persuaded by the eyewitness testimony of expert anesthesiologists Dr. Yen and Dr. Antognini and found that "[i]t is highly probable that an inmate undergoing lethal injection with the Chart D combination of drugs will become insensate to pain within a very short time after the midazolam is pushed and will remain in that condition until injection of the three drugs causes death." *Id.* Similarly, the court found it "highly probable" that John Grant, Bigler Stouffer, Donald Grant, and Gilbert Postelle "felt no physical pain other than that associated with the assertion of the IV lines" during their recent executions. *Id.* For midazolam, the "evidence persuade[d] the court, <u>and not by a small margin</u>, that … it can be relied upon … to render the inmate insensate to pain for the few minutes required to complete the execution." ROA Vol. II, at 2511 (emphasis added). Again, Plaintiff inmates do not challenge these—or any—factual findings by the court.

## IV. The district court correctly analyzed the law in granting summary judgment to Defendants on Plaintiffs' access-to-counsel claims.

In its summary judgment ruling, the district court observed that "plaintiffs assert a right under the First, Fifth and Sixth Amendments, to have their counsel proctor the execution process, from beginning to end, with a view to initiating litigation *if* they see something they deem constitutionally objectionable." ROA, Vol. I, at 5210 (emphasis in original). The court opined, however, that "the right of access to counsel (and, *a*

9

*fortiorari*, to the courts), applies only to *extant* claims"—claims that already exist. *Id.* (emphasis in original). Thus, the claim "as a matter of law, is not sufficient." *Id.*

The district court's ruling arose directly from precedent in this Court and in other circuits. *First*, the district court found relevant this Court's decision in *Lockett. Id.* at 5207. Although the district court admitted that *Lockett* was not precisely on point because it was a qualified immunity case, it found influential this Court's past statements on Lockett's assertion of a right to have counsel monitoring an execution for potential claims. *Id.* at 5207-5208. It positively cited this Court's statements that it was being asked to recognize a new right, that there is "no law that would support" such a right, and that this Court "struggle[s] to envision what such a right would look like." *Id.* at 5208 (quoting *Est. of Clayton Lockett v. Fallin*, 841 F.3d 1098, 1117 (10th Cir. 2016)).

*Second*, because this Court's precedent was not precisely on point, the district court looked to other circuits for assistance. *Id.* at 5210. It found persuasive the Eleventh Circuit's analysis that a "valid right-of-access claim" must show that the inmate "will specifically be prevented from bringing a colorable or viable underlying Eighth Amendment claim." *Id.* (quoting *Arthur v. Comm'r, Alabama Dep't of Corr.*, 680 F. App'x 894, 909 (11th Cir. 2017) (unpublished)). The mere possibility that something might go wrong is not an actionable claim. *Id.* (quoting *Grayson v. Warden*, 672 F. App'x. 956, 966-67 (11th Cir. 2016) (unpublished)). The district court also found persuasive the Fifth Circuit's analysis applying the same rule and holding that the "possibility of a

'botched execution' is an isolated mishap that is not cognizable" in an access to counsel

claim. *Id.* (quoting *Whitaker v. Collier*, 862 F.3d 490, 501 (5th Cir. 2017)).

One contrary authority to this rule, the district court observed, was a vacated

district court decision in Tennessee. *Id.* at 5208; *see also* Appellants' Br. at 11, 19 (citing

*Coe v. Bell*, 89 F.Supp.2d 962 (M.D. Tenn. 2000), *vacated as moot*, 230 F.3d 1357 (6th Cir.

2000)). It rejected that court's decision and was persuaded that the rule in the Fifth and

Eleventh Circuits was the correct view of the Constitution. ROA, Vol. I, at 5208.[2]

In addition to its legal findings, the district court added the practical observation

that a counsel monitoring an execution is unlikely to offer any meaningful benefit. *Id.*

at 5209. It positively cited a discussion from the Middle District of Alabama on how a

last-minute phone call from an inmate's counsel to a judge would be unlikely to merit

any relief. *Id.* (citing *Arthur v. Dunn*, No. 2:16-cv-886, 2017 WL 1362861 at *6 (M.D.

Ala. April 12, 2017)). The district court concluded that "[p]ractical and legal problems,

entwined, are fatal" to the access to counsel claims. *Id.* at 5206.

---

[2] As the district court below observed, even the vacated Tennessee court did not adopt the broad rule Plaintiffs now seek, meaning no authority supports their full claim. *See* ROA, Vol. I, at 5211 ("[E]ven in *Coe*, the district court went no further than to hold that the prisoner had a right of access to counsel up to an hour *before* the execution and that counsel could have access to a telephone while witnessing the execution … all of which, it should be noted, caused that court to observe that it was 'skeptical about a prisoner's realistic ability to assert and get redress for a violation of his right to be free from cruel and unusual punishment during the execution itself.'" (emphasis in original)).

In reviewing the additional argument for access to counsel under 18 U.S.C. § 3599, the district court concluded the claim fails for the same reasons as the inmates' constitutional claim. *Id.* at 5211-5212. It observed that "Plaintiffs cite no authority (and the court has found none) suggesting that, aside from the question of who pays for counsel's services, the right to counsel at the time of execution of a sentence of death is more extensive under § 3599." *Id.* at 5212.

Thus, the district court granted summary judgment against the inmates' access to counsel claims, finding them insufficient as a matter of law.

## SUMMARY OF THE ARGUMENT

The district court correctly granted summary judgment on the inmates' claims that their right to access counsel is being violated. Indeed, Plaintiffs lack standing to bring these claims, as the Constitution does not provide a death-row inmate the right to have his or her counsel access and participate in an execution solely to look for hypothetical claims, developments, or grievances.

Here, Plaintiffs have conceded that they have no existing claims by declining to appeal their total loss at trial in their long-standing challenge to Oklahoma's execution protocol. Because Plaintiffs have failed to assert any underlying claim for which they are being denied access to the courts or counsel, and because the U.S. Supreme Court presumes that State officials will follow the law and their protocols, the inmates' access-to-counsel claim fails. To hold otherwise would create a circuit split, as substantial

authority holds otherwise, and it would ignore that attorneys under Oklahoma's current protocol are allowed to visit inmates two hours before the execution.

Moreover, Plaintiffs' attempt to argue that a presumption of error should be applied here is meritless. Oklahoma has executed five inmates in the past year under its current protocol. Those executions have been closely scrutinized, and the district court held that the four of them that occurred before its ruling were constitutional, refuting many of Plaintiffs' arguments in an order that Plaintiffs have now declined to appeal. The fifth, which took place after this Court denied a stay during this appeal, was complication-free. There is no reason to presume unconstitutionality here.

Finally, to grant Plaintiffs relief here would open the door to the livestreaming of lethal injections, as well as the minute-by-minute micromanagement of those executions by federal judges. For all these reasons and more, relief should be denied.

## ARGUMENT

This Court reviews summary judgment de novo, applying the same legal standard as the district court. *Wilkins v. City of Tulsa*, 33 F.4th 1265, 1271-72 (10th Cir. 2022) (citation omitted). Summary judgment shall be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Here, Defendants made that showing.

I.    **The district court correctly granted summary judgment on Counts IV and V because Plaintiffs do not have a valid access-to-counsel claim.**

The district court appropriately concluded that the Plaintiff inmates do not have a cognizable claim for denial of access to courts or access to counsel. *See* ROA, Vol. I, at 5204-5212. The Constitution does not provide a right to counsel to look for hypothetical claims or developments. In addition, Oklahoma's execution protocol already exceeds constitutional requirements by providing numerous procedural safeguards and allowing inmates to have their lawyers with them until two hours before the execution. *See id.* at 5204-5205. Plaintiffs cannot succeed in demanding more.

A.    *Plaintiffs lack standing to challenge Oklahoma's execution protocol over hypothetical grievances in the execution process.*

Plaintiffs are not satisfied with counsel visiting them until two hours prior to the execution. Rather, they insist they are entitled to an unfettered right to access counsel during an execution for "a hypothetical possibility that an execution *could* go wrong." *Zink v. Lombardi*, 783 F.3d 1089, 1098–99 (8th Cir. 2015) (emphasis in original); *see also* Appellants' Br. at 7 (complaining that their counsel cannot "interven[e] in problems that *may* arise during the execution process") (emphasis added). But as every circuit to consider the question has said, "no constitutional right exists to discover grievances." *Phillips v. DeWine*, 841 F.3d 405, 420 (6th Cir. 2016) (collecting cases); *see also First Amend. Coal. of Ariz. v. Ryan*, 938 F.3d 1069, 1080-81 (9th Cir. 2019) ("[T]he First Amendment right of access to the courts does not include the right of prisoners to 'discover

14

grievances[ ]'" (quoting *Lewis v. Casey*, 518 U.S. 343, 354 (1996))). Even a "request for access to a cell phone or landline [during an execution] is based on the possibility that something might go wrong ..., which does not qualify as an 'actual injury.'" *Grayson*, 672 F. App'x at 967. Because Plaintiffs fail to assert an underlying claim for which access to the courts has been denied, their "access-to-the-courts assertion [also] fails." *Whitaker v. Collier*, 862 F.3d 490, 501 (5th Cir. 2017); *see also Whitaker v. Livingston,* 732 F.3d 465, 467 (5th Cir. 2013) ("One is not entitled to access to the courts merely to argue that there might be some remote possibility of some constitutional violation.").

Without an actual injury—that is, a nonfrivolous and arguably meritorious underlying claim—courts do not have jurisdiction over these types of claims. *See Lewis*, 518 U.S. at 351 ("an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense … the inmate … must go one step further and demonstrate that … he had suffered arguably actionable harm").[3] Plaintiffs spend most of their brief trying to avoid this legal rule that forecloses their appeal.

At the outset, Plaintiffs concede that the *Lujan* standard applies. *Compare* Appellants' Br. at 7-8 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)), *with*

---

[3] Even district courts that decline to follow the actual injury analysis from the Fifth, Sixth, Ninth, and Eleventh Circuits acknowledge "18 U.S.C. § 3599 ha[s] [not] been extended to give rise to these particular types of claims." *McGehee v. Hutchinson*, 463 F. Supp. 3d 870, 925, 932 (E.D. Ark. 2020).

15

Order, Aug. 20, 2022, at 4. Then, Plaintiffs spend several pages explaining the standard that applies for access to courts to litigate *existing* claims without once explaining what underlying existing claim is at issue. *See* Appellants' Br. at 8-11. In doing so, they waffle between whether their issue relates ultimately to having, through their counsel, access to the Governor, *id.* at 11, or access to courts, *id.* at 13.

If Plaintiffs meant to appeal the denial of their access to the Governor (and not the courts), that claim is forfeited for failure to raise it in the district court. "An issue is waived if it was not raised below in the district court." *Wilburn v. Mid-S. Health Dev., Inc.*, 343 F.3d 1274, 1280 (10th Cir. 2003). Their complaint and their summary judgment brief all exclusively addressed the issue of access to the courts, not access to the Governor. ROA Vol. I at 197-199; *id.* at 4083-4087. This new argument is forfeited.

The claim is also frivolous. Even assuming 18 U.S.C. § 3599 applies to gubernatorial proceedings, there is no authority, and Plaintiffs cite none, that gives them unfettered access to the Governor beyond statutory proceedings. The inmates have a statutory clemency proceeding that they all reliably access, and the Governor's discretion beyond the clemency process is his alone. Indeed, Plaintiffs' own citations confirm that the Governor monitors the process through oversight of Defendants, *not* through contact with inmate attorneys. ROA Vol. I at 1982-89 (referencing the Oklahoma Department of Corrections notifying the Governor). Plaintiffs' use of the passive voice regarding the Glossip execution attempt in 2015 (saying "The Governor

16

was notified") omits the key fact that it was the DOC staff—*not* inmate lawyers—that contacted the Governor. Appellants' Br. at 12.[4]

Similarly, uncontested trial testimony establishes that the Department of Corrections Director reports to the Governor and the Governor's Secretary of Public Safety, who would intervene if necessary in the Director's management of any execution. ROA Vol. IV at 1689-1690. The Governor also had a representative of his office or his cabinet present at recent executions. *Id.* at 1690. Nothing in the trial record or in Plaintiffs' citations to executions under prior protocol and personnel indicates that inventing an unfettered right for inmates to contact the Governor would improve executions, let alone that such a right is constitutionally required. Thus, even if the access-to-Governor claim were not forfeited, it would be meritless.

On the other hand, assuming Plaintiffs meant to appeal on the ground that they are being denied access to the courts rather than the Governor, then their claim reduces to nothing more than an improper request for a presumption of the existence or validity of future hypothetical claims. But there is no right to have counsel bring a claim already

---

[4] Plaintiffs also try, in passing, to relitigate claims regarding Oklahoma's three-drug protocol. They argue, for instance, that the "incorrect drug" caused Charles Warner pain in 2015, Appellants' Br. at 13, but their cited underlying allegation was that Warner had only received midazolam—and not yet the (incorrect) potassium drug—when he made the cited statement, ROA Vol. I. at 154; *see also* ROA Vol I. at 345 (denying the allegation). Their claim here is just an improper attempt to litigate their complaints about midazolam that the district court below disagreed with and that they did not appeal. *See, e.g.*, ROA Vol. II, at 2511 ("The evidence persuades the court, and not by a small margin, that … [midazolam] can be relied upon … to render the inmate insensate to pain for the few minutes required to complete the execution.").

17

foreclosed by precedent, and an "isolated mishap alone does not give rise to an Eighth Amendment violation." *Baze v. Rees*, 553 U.S. 35, 50 (2008). Accordingly, even if an isolated mishap occurred during an execution in the past or in the future, that would not create a concrete injury sufficient to establish standing.

Furthermore, absent a demonstration to the contrary, the Supreme Court presumes that state prison and correctional officials will follow their statutory commands and internal protocols in fulfilling their obligations. *See, e.g., Garner v. Jones*, 529 U.S. 244, 256–257 (2000) (finding a court of appeals erred by disregarding that presumption). The application of that presumption here illustrates the futility of Plaintiffs' complaint, as the execution protocol provides for continuous monitoring, checking, and recording of the execution process. ROA, Vol. I, at 5204-5205. It also provides several procedural protections should courts intervene or the Director of the Department of Corrections determine a halt is necessary. *Id.* Plaintiffs focus on executions from seven years ago under a different protocol with different personnel because the current protocol worked correctly for all recent executions, as the district court held in a ruling Plaintiffs haven't appealed. *See infra* Part I.C. Plaintiffs cannot win an appeal on the merits without actually appealing the merits, and they cannot win an appeal in the present based on issues unrelated to this appeal found in the past.

Lacking any cognizable injury under existing precedent, Plaintiffs make two further arguments. First, they ask this Court to apply a different standing analysis to

18

claims related to executions. Appellants' Br. at 16. Second, they ask this Court to convert their subjective and baseless fears into cognizable injuries. Appellants' Br. at 17. Neither argument has merit.

No published authority fully endorses setting aside *Lujan* in the execution context. Plaintiffs' citation to *McGehee* does not avail them because *McGehee* granted no relief on the basis of standing, deciding in the end only to enforce an agreement between the parties and otherwise firmly deny that plaintiffs have any right to bring "their attorneys to see and hear the full execution." *McGehee*, 463 F. Supp. 3d at 931-32; *see also id.* at 932 ("Without an actual injury, this Court does not have jurisdiction over the [access-to-courts] claim."). Likewise, Plaintiffs' citation to *Hoffman* does not assist them in any great way because the Court in *Hoffman* found a valid underlying claim, only adding in dicta its (incorrect) belief that an inherent risk, rather than a reality, is enough for an injury in this context. *See Hoffman v. Jindal*, No. 12CV796, 2014 WL 130981, at *7 (M.D. La. Jan. 10, 2014).

The best authority Plaintiffs can muster is a lone unpublished district court decision (apparently un-appealed) that found a triable issue on whether certain inmates had a right to communicate speculative claims. *See Cooey v. Strickland*, No. 2:04CV1156, 2011 WL 320166, at *11 (S.D. Ohio Jan. 28, 2011). At least some of the reasoning in that 2011 opinion was seemingly rejected by the governing circuit court five years later in a published opinion. *See Phillips v. DeWine*, 841 F.3d 405, 417-20 (6th Cir. 2016)

(holding, in the execution context, that "Plaintiffs have failed to state a claim for a violation of their right of access to government proceedings"). In short, Plaintiffs are asking this Court to create an exception to the Supreme Court's actual injury analysis, and create a circuit split in the process, based on a single unpublished district court opinion that may no longer be good law in its own circuit. The district court rightly rejected this suggestion, and this Court was correct to previously reject that it "may apply a different actual-injury standard than the general Article III standard in the context of an ongoing execution." Order, Aug. 20, 2022, at 4.

Similarly, no published authority allows fear of hypothetical claims to suffice for injury in fact. In the *TransUnion* case that Plaintiffs cite, for example, the Supreme Court was clear that, while "a plaintiff's knowledge that he or she is exposed to risk of future physical … harm *could* cause its own current emotional or psychological harm," the Court was taking "*no position* on whether or how such an emotional or psychological harm could suffice for Article III purposes." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2211 n.7 (2021) (emphases added).

Plaintiffs' argument is also problematic because it creates an exception to standing that swallows the rule: if a plaintiff who lacks an injury can point to his own baseless fear of future injury to maintain a suit, then everyone has standing. No injury evidence would ever be needed. Plaintiffs make little attempt to explain how the rule comports with Article III. *See Wilburn v. Mid-S. Health Dev., Inc.*, 343 F.3d 1274, 1281

20

(10th Cir. 2003) (this court "will not consider issues that are raised on appeal but not adequately addressed"). This Court should reject Plaintiffs' undeveloped and unsupported theory and conclude that Plaintiffs lack standing.

**B.      *There is no right to counsel to search for hypothetical grievances.***

The standing issue is related to the merits of Plaintiffs' claim because they are asserting a right that does not exist. Just as a hypothetical future injury is not an injury in fact, *see supra* Part I.A, there is also no right to counsel for hypothetical future claims. *Phillips*, 841 F.3d at 420 (collecting cases).

Plaintiffs attempt to sidestep this problem by reframing their argument as about access, not about a speculative claim. Appellants' Br. at 8-11. But as Plaintiffs are well aware, inmates in this case have accessed the courts and filed injunction motions numerous times, including on the very day of the execution. *See* ROA, Vol. II, at 1170-90 (Julius Jones' emergency injunction motion filed on scheduled day for Jones' execution). Thus, there is no issue about access to file existing claims. *Contra* Appellants' Br. at 14-15. Perhaps that is why the Arkansas case they quote only discusses "prospective Eighth Amendment violation[s]"—because it too did not involve any issue of access to file existing claims. *Id.* at 15 (quoting *McGehee*, 463 F. Supp. 3d at 925). Moreover, *McGehee* granted no relief on that basis, deciding only to enforce an agreement between the parties and otherwise firmly deny that plaintiffs have any right to bring "their attorneys to see and hear the full execution." *McGehee*, 463 F. Supp. 3d

at 931-32. The district court below followed the actual holdings in that case, not the stray language Plaintiffs quote. *See* ROA, Vol. I, at 5211 n.21.

Because Plaintiffs fail to tie their claim of access to court and counsel to any alleged or plausible violation of rights that they need counsel and courts to pursue, no *Turner* analysis is appropriate. The *Mann* case they cite, which applied *Turner*, involved access to counsel for existing claims. *See Mann v. Reynolds*, 46 F.3d 1055, 1056-57 (10th Cir. 1995) (citing *Turner v. Safley*, 482 U.S. 78 (1987)). In that case, there was no dispute that the right to counsel for existing claims attached. *See id.* at 1057. The question at issue was whether it was appropriate under that right to single out attorneys for restricted contact. *See id.* at 1060. Moreover, *Mann* itself emphasized that "full and unfettered contact between an inmate and counsel" is not required in all instances, and that the "Supreme Court has left matters of security to the sound and principled discretion of prison administrators." *Id.*

Plaintiffs' claim does not implicate *Turner* or *Mann* because Plaintiffs are challenging access to counsel and courts for prospective claims, not existing ones. For existing claims, attorneys under Oklahoma's current protocol are given *advantageous* treatment because they can visit the inmate two hours before execution—the exact opposite of the problem in *Mann*, where access to counsel was denigrated as compared to access to other visitors. They also advance no serious argument here why singling

counsel out for special advantages for existing claims would count as singling out attorneys for a *disadvantage* under *Turner* or *Mann*.

Because Plaintiffs' access-to-counsel contention only addressed prospective claims, it was properly denied for lack of a cognizable constitutional right. Questions of timing or curtailment of rights are irrelevant when no cognizable right is at issue. Plaintiffs' arguments that ignore the district court's holding cannot be a basis for reversing the district court's order.

In sum, Plaintiffs' unsupported demand for a broader right is no answer to the extensive authority holding that access to counsel or courts requires an existing claim. The Plaintiff inmates only want to search for new claims: they seek a lawyer to "identify, object to, challenge, or correct, any issues with the IV-setting or drug administration process." ROA, Vol. I, at 197-98 ¶¶ 137-140. At one point, they even admit that they want counsel to "interven[e]" in the execution process. Appellants' Br. at 7. Their desire for help concocting new claims, or even for interfering with the execution process itself, is not a constitutional claim. This is especially so after they tried and lost their existing Eighth Amendment claims and do not challenge that loss on appeal, nor do they appeal any of the other issues on which the district court granted summary judgment against them. ROA Vol. I, at 5178-5220 (granting summary judgment to Defendants on Counts VI, VII, IX and X).

The recent chaplain cases from the Supreme Court do not help Plaintiffs because they are based on the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). *See Ramirez v. Collier*, 142 S. Ct. 1264, 1272 (2022). RLUIPA protects the religious exercise of anyone confined in an institution. *See id.* at 1277. As such, inmates are able to request chaplains based on their sincere religious beliefs. *See id.* Plaintiffs do not assert a religious exercise right in this appeal, however, and RLUIPA is not at issue. Nothing in *Ramirez* otherwise gives inmates a free-wheeling right to make "alterations to the protocol[,]" Appellants' Br. at 23, untethered from a religious-based right.

Plaintiffs also fail to state a cognizable interest under the Fifth or Sixth Amendment. As an initial matter, the Fifth Amendment Due Process Clause applies only to the federal government, not the states. *See* ROA, Vol. I, at 385-86 & n.1. Plaintiffs never sought leave to amend this error in their complaint, and this claim was properly denied on that ground alone. ROA Vol. 1, at 5179-5180. Furthermore, Plaintiffs failed to prove a cognizable due process interest under the Fourteenth Amendment. *Cf. Livingston*, 732 F.3d at 467 ("Even if the Fourteenth Amendment sometimes protects liberty interests not explicitly enumerated in the Constitution, we know of no case, in the context of executions, in which the Supreme Court has found a liberty interest to exist, based on the contours of the Eighth Amendment, that goes beyond what that Amendment itself protects."). The lack of an underlying claim means there is no cognizable due process interest, which is fatal to Plaintiffs' due process claim.

24

Nor is the execution of a sentence a judicial proceeding in which Plaintiffs have a Sixth Amendment right to counsel. Not being able to have a lawyer hover over, fly speck, and "interven[e]" in an execution is not a violation of Fifth or Sixth Amendment rights. *See Whitaker v. Collier*, 862 F.3d at 501 (the Sixth Amendment right to counsel only "extends to the first appeal of right, and no further." (quoting *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987)).

Even assuming 18 U.S.C. § 3599 confers some right beyond the Sixth Amendment—an unsupported theory the district court correctly rejected—there is no right to have counsel bring a claim already foreclosed by precedent. *Baze*, 553 U.S. at 50. Likewise, no authority supports the inmates' new argument on appeal that § 3599 provides a right to counsel to contact the Governor at any time outside the statutory clemency procedure. The district court correctly rejected any reading of § 3599 that exceeds the Sixth Amendment.

### C. *The record does not support Plaintiffs' attempts to establish a presumption of error.*

The Plaintiff inmates argue that this Court "need not speculate" about future claims because "it is apparent from Oklahoma's past executions" that problems are commonplace and will arise. Appellants' Br. at 13. In essence, they seek a presumption moving forward that Oklahoma executions will have constitutional issues.

But the only details Plaintiffs point to from recent Oklahoma executions—rather than Oklahoma executions seven years ago, under a different protocol, with different

personnel, or executions from other States—is that the Department of Corrections had the wrong sticker label on a shadow board that was used primarily for color-coding and was outside the execution chamber. ROA, Vol. II, at 2495–2596. (The sticker said rocuronium bromide instead of vecuronium bromide.)

The Constitution provides no right to correct sticker usage in and of itself, and nothing about this situation creates a right for Plaintiffs to have counsel present inside the execution chamber. Furthermore, as Plaintiffs admit, the correct drugs were administered with the correct labels on the syringes. Appellants' Br. at 6; *see also* ROA, Vol. II, at 2496-2497. Indeed, the district court concluded in its findings of fact: "[t]he court is satisfied that vecuronium bromide was used in each of the four recent Oklahoma executions." *Id.* at 2497.[5]

Otherwise, Plaintiffs rely on baseless speculation that the district court rejected at trial to insinuate Defendants may not follow the execution protocol. They make the vague assertion, for example, that the Director will freely revise executions ad hoc, Appellants' Br. at 5, 22, without acknowledging the district court's factual findings that this "speculative argument" was not credible. *See* ROA, Vol. II, at 2517 n.32. Based on testimony at trial, the district court was "well-satisfied" that "there is essentially no

---

[5] As mentioned above, Oklahoma's execution protocol expressly allows for the use of rocuronium bromide. ROA Vol. II, at 2484 & n.9; ROA Vol. I, at 838.  Indeed, for the recent execution of James Coddington, the Department of Corrections decided to use rocuronium instead of vecuronium. In accordance with the protocol, ROA Vol. I, at 839, Coddington was informed of this decision at least 10 days in advance of the execution.

possibility" that the Director or the operations chief will "water down" the process. *Id.* Plaintiffs do not disclose the contrary factual findings to this Court, and they cannot overcome them on appeal when they do not even cite or challenge them directly.

It is also notable what Plaintiffs do *not* provide or point to: any historical evidence that lawyer presence, monitoring, or participation have *ever* been considered vital or constitutionally required during executions in our nation's history. Both in the death penalty context and others, the U.S. Supreme Court has repeatedly emphasized the significance of historical practice. *See, e.g.*, *Ramirez*, 142 S. Ct. at 1278 ("[T]here is a rich history of clerical prayer at the time of a prisoner's execution, dating back well before the founding of our Nation."); *Bucklew*, 139 S.Ct. at 1126-27 ("Bucklews' argument … is inconsistent with the original and historical understanding …"); *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2247 (2022) ("Historical inquiries … are essential whenever we are asked to recognize a new component of the 'liberty' protected by the Due Process Clause …."). Yet here, there appears to be no historical precedent for any of Petitioners' requests, such as lawyer involvement or intervention. At minimum, they are absent from the briefing and the record.

To be sure, the inmates argued in their reply for an emergency stay—although not in their opening brief here, strangely—that historically "executions in the United States were [public] spectacles," as the "public, including any representative of the condemned, were long permitted to view the entire execution process." Appellants'

27

Emerg. Reply at 7-8; *see also First Amend. Coal. of Arizona,* 938 F.3d at 1075 ("executions have historically been open to the press and the general public"). Noticeably absent from this historical fly-by, however, is any claim that attorneys were given special treatment during an execution above and beyond members of the general public, or that a condemned individual's attorneys would have been allowed to intervene in the public process once it had begun. Defendants are not actually arguing that the historical record shows the opposite—it might, it might not. Rather, they are simply pointing out that the Supreme Court strongly values such evidence and that Plaintiffs, who have the burden here, have nevertheless barely even tried to put together a historical case. Their neglecting to mention, in their opening brief, the little historical evidence they have been able to find highlights this point even further.[6]

### D.    *Inserting hostile lawyers with cell phones into executions would create substantial practical problems and imperil the entire process.*

Finally, the Plaintiff inmates do little to assuage the obvious and enormous practical concerns present with permitting a roving lawyer with a cell phone into the execution chamber itself, with an express mandate to "interven[e] in problems."

---

[6] Plaintiffs ignore several other problems with their theory, as well, such as the fact that inmates are not entitled to have counsel with them for most of their time in prison. There is no constitutional right, for example, for an inmate to undergo medical procedures with counsel present. And Plaintiffs also gloss over the fact that lawyers are already permitted to witness executions from the viewing room—*if* the inmate designates them as a witness. Defendants cannot imagine what right a counsel might have to be present in a situation where the client has not requested the attorney's presence.

Appellants' Br. at 7. To begin, a lawyer is not a doctor, a nurse, or a trained Department staffer. A lawyer is simply not qualified to diagnose problems on the spot with "the setting of IV lines" and IV access, Appellants' Br. at 21, 24, much less decide when "interven[tion]" might be necessary, *id.* at 7. (This issue alone distinguishes the lawyer from the minister, who is presumably qualified to serve his ministerial role up until the moment of death.) Indeed, although Plaintiffs do not admit it, the next logical step here would be a demand to allow their experts to be present to assist the lawyer in analyzing the situation. And so on. In short, counsels' demands here could lead to much of the viewing crowd being moved into the execution chamber itself. If this circus were permitted, the medical professionals on the execution team would almost certainly be hindered in implementing a safe process. Plaintiffs attack the State's protocol as being irrational on these points without any attempt to challenge factual findings in the district court or otherwise engage with these obvious practical problems.[7]

Continually adding more people to the chamber is not the only problem, either, as allowing a person with a *cell phone* into the viewing room or execution chamber would create other unique and sensitive issues, to say the least. Perhaps most troublingly, this approach would lead to the distinct possibility of the country's first livestreamed lethal

---

[7] Tellingly, Plaintiffs do not explain how exactly counsel plans to "interven[e] in problems." Appellants' Br. at 7. But this is a critical question that would have to be answered, in detail. Would the lawyer have free reign to physically intervene? The vague reference to Lockett, *id.* at 13, is no answer because Plaintiffs offer no explanation what more a counsel or court would have done beyond the Governor's order to stop that execution.

injection. Even aside from that, the distraction to the execution team—whether from the counsel, the phone, or both—would assuredly be immense. It would also invariably lead to an environment where federal district court judges are *expected* to be on the phone with defense counsel throughout every single execution, getting a play-by-play (and video) of the proceedings. Such micromanagement by federal courts is in no way constitutionally required, *see Lockett*, 841 F.3d at 1117 ("[W]e struggle to envision what such a right would look like in practice."), yet that is what Plaintiffs seek. The district court correctly recognized that such freewheeling micromanagement of execution proceedings, untethered from existing claims or RLUIPA, has no basis in the federal Constitution. *See* ROA, Vol. I, at 5209-5210.[8]

Thus, the district court correctly granted summary judgment on Counts IV and V because they fail as a matter of law.

## CONCLUSION

This Court should either affirm the district court's grant of summary judgment or dismiss this appeal for lack of Article III jurisdiction.

---

[8] For many of these same reasons, if this Court were to decide to apply the *Turner* analysis, it should find it likely that preventing a counsel with a cell phone from roaming the execution chamber with an eye to "intervening," Appellants' Br. at 7, is "reasonably related to legitimate penological objectives." *Mann*, 46 F.3d at 1060 (internal marks omitted) (quoting *Turner*, 482 U.S. at 86). In disagreeing with this, Plaintiffs cite the Supreme Court's analysis in *Ramirez v. Collier*, Appellants' Br. at 25, but ignore that an RLUIPA review is far more demanding than *Turner*. RLUIPA requires the government to use the "least restrictive means of furthering" a "compelling governmental interest." *Ramirez*, 142 S. Ct. at 1277.

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs raise a single issue on appeal—an issue that this Court already noted lacks Article III jurisdiction. *See* Order, Aug. 20, 2022. Oral argument would therefore not assist the Court in resolving the appeal, so Defendants oppose oral argument.

s/ *Zach West*

ZACH WEST
   *Solicitor General*
BRYAN CLEVELAND
   *Deputy Solicitor General*
AUDREY WEAVER
   *Assistant Solicitor General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
zach.west@oag.ok.gov

*Counsel for Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE

This response complies with the typeface requirements of Fed. R. App. P. 32 because it was prepared in a proportionally spaced font (Garamond, 14-point) using Microsoft Word 2016. The document complies with the type-volume limitation of Fed. R. App. P. 32, because it contains 8,221 words, excluding the parts exempted.

s/ *Zach West*
ZACH WEST

## CERTIFICATE OF DIGITAL SUBMISSION

All required privacy redactions have been made as required by 10th Cir. R. 25.5 and the ECF Manual. Additionally, this filing was scanned with Crowdstrike antivirus using the latest version updated on July 29, 2022.

s/ *Zach West*
ZACH WEST

## CERTIFICATE OF SERVICE

I certify that on September 27, 2022, I caused the foregoing to be filed with this Court and served on all parties via the Court's CM/ECF filing system. The seven required paper copies, each of which is an exact replica in form and content, will be dispatched via commercial carrier for receipt within five business days after the court issues a notice that the electronic version is accepted for filing.

s/ *Zach West*
ZACH WEST